John E. MORDICA, trading as Little Creek Diesel Power Co., Libellant and Cross-Respondent,

v.

NORFOLK SHIPBUILDING & DRY-DOCK CORPORATION, Respondent and Cross-Libellant.

No. 8104.

United States District Court
E. D. Virginia,
Norfolk Division.

May 29, 1961.

David H. Batchelder, Jr., Myer Koteen, Norfolk, Va., for libellant and cross-respondent.

Vandeventer, Black, Meredith & Martin, Norfolk, Va., for respondent and cross-libellant.

WALTER E. HOFFMAN, District Judge.

In the fall of 1959 libellant was the successful bidder on a salvage contract awarded by the Corps of Engineers for the raising of the trawler Minnie V sunk on the north side of Thimble Shoal channel between the No. 2 and No. 4 buoys. The sunken trawler was 50.2 feet in length, 15.4 feet in breadth, 6.7 feet in depth, and weighed 26 gross tons. Libellant initially surveyed the job on or about November 16, 1959, at which time it was decided to use cable slings. Installing the proper equipment on the trawler and preparing the slings required several months of sporadic work, with Navy divers working on occasional weekends in 40 feet of water under adverse weather conditions.

On February 11, 1960, Lloyd Edward (Pete) Mordica, the libellant's father and admitted representative in business matters, discussed the salvage operation with respondent's general superintendent. After negotiating as to the several steps and methods of operation, and after declining respondent's offer to do all of the work involved for $800, the parties agreed that libellant would do and provide the necessary rigging, with respondent supplying a tug and floating derrick at $60 per hour for the equipment and essential personnel. Lloyd Edward Mordica, in referring to the equipment, indicated that the weight of the trawler would not exceed 15 tons, although the general superintendent had also been told by libellant's rigging boss that the vessel weighed 20 tons.

In good weather and a calm sea on February 16, 1960, Lloyd Edward (Pete) Mordica took libellant's pumps to respondent's shipyard, placed them aboard the derrick rig, and the equipment consisting of the tug and derrick was then moved to the scene of the wreck where it arrived shortly after noon. The equipment was rented on a portal-to-portal basis. The libellant, two Navy divers, a consultant, a machinist, and a representative of the Corps of Engineers were already at the scene with a small tug and a small boat, the latter being used to carry the divers. Respondent's tug was 62 feet in length with 500 H.P. motors. It was manned by its captain, Haddock. The derrick rig was manned by a crane operator, Wilson, and a fireman, Ford. The crane was tested for rigging capacity at 37½ tons for a static load and 19 tons for a working load. The derrick was rated at 25 tons. The dead weight of the sunken trawler was 25 tons, and the rigging portion of the crane was deemed capable of lifting the trawler considering its buoyancy in the water.

The original plan was to raise the trawler to water level, place the pumps aboard, and thereafter pump the water from the trawler, to make her float. She was then to be hoisted aboard the barge and carried to Little Creek. With the trawler lying on her port side, it was necessary to place cables around the vessel. The crane operator then lowered the block from the derrick and the diver

hooked the cable lines, thus permitting the wreck to be raised. Libellant was using ⅝″ cables, 30 feet in length, the safe working load for which is only approximately 3½ tons. On the initial effort to raise the vessel, the sling parted. The next time the diver used two ⅝″ cables and doubled them. The diver explains the parting of the sling by saying that he dropped a pin and then came to the surface where another shackle was handed to him. The pin is about 8″ in length, with approximately 2″ of thread, and an eye hook in the end. Admittedly the diver tightened the pin by hand—a procedure tending to permit the pin to work out of the shackle if not sufficiently tight. A marlin spike is frequently used to prevent the pin from coming loose.

Lloyd Edward (Pete) Mordica was aboard the derrick during the raising operations, along with the relief diver, the crane operator, the fireman and inspector from the Corps of Engineers. Pete Mordica has since passed away and the Court is without the benefit of his testimony. He undoubtedly was directing the salvage operations, at least to the point when the trawler was placed in tow for the purpose of taking her into shallow water. On the second effort the wreck was raised to a point where the mast was about ten feet out of the water at a 45° angle. The stern of the wreck came up under the bow of the derrick (the bow being actually the stern of the tug-derrick combine). The crane operator suggested to Pete Mordica that a line be hooked to the bow of the trawler to pull it around, but Mordica did not approve of this procedure. As the trawler was still on her side, it was impossible to use the pumps. Mordica directed that three guide lines be attached to the block to guide the wreck, thus keeping it from damaging the derrick barge. Mordica then instructed the tow to proceed to shallow water near Little Creek, where the trawler would then be righted and pumped. Mordica thereafter left the derrick barge and boarded libellant's small tug. As the tow proceeded at a relatively slow pace, with the crane-barge stern first, only

the crane operator, the fireman, and one diver remained aboard the derrick.

The parties differ as to the source of the second shackle used in the salvage operation. Libellant contends that the shackle was secured from the barge, but there is no credible evidence establishing the fact that it was given to any of libellant's employees by any employee of respondent. While it is not unlikely that the shackle came from the barge, the use of same was not at the instance of the respondent. It probably was taken by Pete Mordica from the deck of the barge without any specific authority.

The tow proceeded at an over-the-bottom speed of 1½ miles per hour. On two occasions Pete Mordica sent word to "shake her up." He later came aboard respondent's tug to convey his request in person. The tug captain increased his speed to approximately two miles per hour over-the-bottom. No signals were displayed indicating that the tug was towing a sunken object, § 80.18, Code of Federal Regulations, but this apparent violation has no bearing upon the ultimate loss of the trawler as it could not have contributed to the loss of the wreck. In due time a ship was seen approaching and about to pass at a distance of approximately ½ mile away. The crane operator gave a signal to stop, which was done. Nevertheless, with the influence of the tide the tow was still going through the water. The passing vessel created a wake of from 2 to 3 feet in height. The load of the wreck was not locked, but the crane operator permitted the same to ride on the brake and friction; it being demonstrated by the only testimony on the subject that it is never good practice in handling a heavy load to lock it off.

The crane operator, who remained at the controls throughout the tow, was admittedly apprehensive about the passing vessel and the waves caused by same. To lower the trawler without slacking off the lines would have brought the trawler further under the barge, with the possibility of snapping the lines. The diver observed the crane operator work the con-

trols just prior to the time the wreck dropped. About 5 minutes prior to the drop, the crane operator attempted to get Pete Mordica's attention to slack off the lines, but his efforts were unsuccessful. The operator admits throwing the friction out, preparatory to slacking the lines, when the wake approached, but this act had on effect upon the capacity of the load and no lessening of the holding power of the brake. Since the load dropped almost immediately thereafter it is to be expected that the diver assumed that this act caused the load to drop. The Court, impressed with the frankness of the crane operator, accepts his version as to the dropping of the trawler.

If the trawler dropped by reason of a pin working loose from the shackle, if it was caused by any defective rigging equipment, or if it was due to the manner in which the wreck was rigged, these are acts for which libellant was responsible as Pete Mordica was in control of this phase of the operation. It is only if the crane operator negligently released the load that any liability could attach to respondent. The evidence does not support libellant's contention. The tug and barge proceeded into Little Creek following the loss of the wreck. At libellant's direction the tug and barge proceeded to the approximate spot of the drop on the following date and, at the request of libellant, the respondent provided a diver. For several days the services of respondent's diver were utilized by libellant. The wreck could not be located although respondent's diver expressed the belief that he may have been on the trawler on one occasion but he could not identify same.

Libellant made no contention as to any broken shackle or any improper navigation on the part of respondent, until after the receipt of respondent's bill dated March 16, 1960. He assigns as a reason the fact that it was obvious. Libellant concedes that if respondent performed its contract in a proper manner, the amount of respondent's bill is correct.

Libellant's evidence tends to show that the shackle came out of the water after the trawler was lost. There is no evidence that the pin was sheared, and neither the shackle nor pin were presented in evidence. It is, of course, fundamental that the mere happening of an accident to a tow raises no presumption of negligence and the burden is upon the party asserting negligence. The Director, 4 Cir., 21 F.2d 47.

This conclusion is reached without regard to the loaned-servant doctrine urged by the respondent. That Mordica directed all phases of the operation while the trawler was being raised is substantially undisputed, but such a fact does not, of necessity, call for a continuation of the special employer rule to the actual time of the loss of the trawler. The decision in this case is predicated on the facts and libellant's failure to meet the burden of proof.

A decree will be entered dismissing the libel and awarding a judgment in favor of the cross-libellant against the cross-respondent in the sum of $1,515, plus interest from April 16, 1960, at 6% per annum.